## THOMAS J. BUNN
## v.
## THIRD NATIONAL BANK.

*Banks—Deposit—Failure to Credit—Evidence—Instructions—Practice.*

1.   While it is the province of the jury exclusively, in the first instance, to judge of the credibility of witnesses, their judgment should not be allowed to stand if it appears to be clearly unreasonable.

2.   The fact of the occurrence of errors in accounts is to be believed when proved in the usual manner unless the witness is discredited on some other and reasonable ground.

3.   Abstract improbability is not alone sufficient to discredit statements of even a single witness, although made upon a subject in which he has a personal interest.

4.   Errors in the instructions of the court below held to have been misleading as to the legal effect of evidence.

[Opinion filed May 24, 1890.]

IN ERROR to the Circuit Court of McLean County; the Hon. A. SAMPLE, Judge, presiding.

Messrs. KERRICK, LUCAS & SPENCER, for plaintiff in error.

" It is a well settled rule that a witness can not be cross-examined as to any fact which is collateral and irrelevant to the issue, merely for the purpose of contradicting him by other witnesses, if he should deny it, thereby to discredit his testimony; and if a question is put to a witness which is collateral or irrelevant to the issue, his answer can not be contradicted by the party asking the question, but is conclusive against him." 1 Greenleaf's Evidence, Sec. 499, Redfield's Edition; Spencely v. DeWillott, 8 East, 108; Combs v. Winchester, 39 N. H. 1; C., B. & Q. R. R. Company v. Lee, 60 Ill. 504; Wharton's Evidence, Sec. 558; C., R. I. & P. R. R. Company v. Bell, 70 Ill. 105.

" A witness can not be cross-examined as to any distinct collateral fact for the purpose of afterward impeaching his testimony by contradicting him. If a question as to a collateral fact be put to a witness for the purpose of discrediting his testimony, his answer must be taken as conclusive, and no evidence can be afterward admitted to contradict it." 1 Starkie's Evidence, 189; C., B. & Q. R. R. Co. v. Lee, *supra.*

" It is a settled rule of practice that when a witness is cross-examined on a matter collateral to the issue, he can not, as to his answer, be subsequently contradicted by the party putting the question." Wharton's Evidence, Sec. 599.

" On cross-examination, for the purpose of testing the memory or honesty of the witness, questions may be asked relating to matters collateral to the issue, and the answer to which would neither be relevant nor material to the issue; but the party putting the questions must take the answers as they are given. He can not produce evidence to disprove them, nor to contradict the witness by his own previous statements." Combs v. Winchester, *supra.*

" The same rule obtains if a question as to a collateral fact be put to a witness for the purpose of discrediting his testimony; his answer must be taken as conclusive, and no evidence can afterward be admitted to contradict it." Ware v. Ware, *supra.*

" The testimony which a witness had given and his answers

being as to a collateral matter, had to be taken as conclusive."
C., R. I. & P. R. R. v. Bell, *supra*.

In cases where there is any uncertainty as to the correctness
of the verdict the court will always reverse.   I. C. R. R. Co.
v. Maffit, 67 Ill. 431; Volk v. Roche, 80 Ill. 297; Steinmeyer
v. The People, 95 Ill. 387; Cushman v. Cogswell, 86 Ill. 62;
Hoge v. The People, 117 Ill. 45; Wabash R. R. Co. v. Henks,
91 Ill. 406.

In the Steinmeyer case, Craig, J., says: "It is true the
instructions on the same subject given on behalf of the defend-
ant, laid down the law correctly.   But that is not enough.
The jury may have disregarded the instruction for the defend-
ant and followed those for the people.   They had as much
right to follow the one as the other, and it is impossible for
the court to say which instructions controlled the deliberations
of the jury.   If the jury followed the sixth instruction given
for the people, as we may presume from the verdict they did,
then they were misled."

In the Hoge case, *supra*, Scholfield, J., says: "It is con-
tended, however, that even conceding the instructions to be
erroneous, they furnish no ground to reverse the judgment
below because   *   *   *   the errors in them were cor-
rected by other instructions, in which the law was fully and
accurately stated.   It is our practice, when we can see from
the record that the evidence was so overwhelmingly against
the defendant that had the jury been instructed properly they
must still necessarily have found as they did, to decline to
reverse for mere error of instruction.   But when the evidence
upon the question of guilt is not such that all honest minds
of ordinary intelligence must necessarily come to the same
conclusion after giving it proper consideration, the defendant
is entitled to have it passed upon by a jury instructed with
substantial accuracy as to the law applicable to it."

Mr. JOHN E. POLLOCK, for defendant. in error.

PLEASANTS, P. J.   This was an action of assumpsit brought
by plaintiff. in error in June, 1888, upon his claim that on
April 24, 1883, he made a deposit in the bank, for a part

of which, amounting to $510, through his own oversight, he received no credit, and which the bank refuses to pay. The cause was tried by a jury, and on their verdict, which the court refused to set aside, judgment was entered for the defendant.

At the time of the alleged deposit plaintiff was cashier of this bank, and also, as he had been for several years, treasurer of the board of education of the city of Bloomington. The money of the board, as he received it from time to time, was deposited by him in the bank to its credit. The account was kept in its name on the books of the bank and on the pass book which was in the hands of the secretary of the board. School orders on the treasurer were paid, not on checks drawn by him, but on such orders directly, and charged to that account.

On the 24th of April, 1883, the township collector paid to plaintiff as such treasurer, for taxes due the board, the sum of $14,180.49, of which $13,670.49 was in his check on another bank, and the balance, $510, in seventeen coupons cut from bonds issued by the board of education. These coupons were identified by the acting cashier of the First National Bank as having been paid by him to the collector on that day, for taxes due from said bank. The payment by the collector to plaintiff was doubtless made in the bank and while the latter was acting as teller in the temporary absence of his son. He then made out a deposit ticket of that date, showing as deposited by the board of education only " currency, $13,670.49," the amount of the collector's check, and made a like entry on the teller's cash book; and on the teller's spindle was found, on the same day, a blank check as follows:

" BLOOMINGTON, ILL., 4124,

Third National Bank.

Pay to............................or bearer.

......Coupons....................... dollars.

BOARD OF EDUCATION,

$510                                     T. J. B.,"

on which was stamped the words: "Third National Bank, paid Apl. 24, 1883, Bloomington, Ill.," and to which was pinned

the seventeen coupons referred to. The written matter in said check being the figures indicating the month and day of the month in the date, coupons, amount, abbreviation of the name of the board and his own initials, was all in the hand of plaintiff. In the board's account on the deposit book of the bank appear the following entries as of that date: on the credit side, "Apl. 24, city tax $13,670.49," and on the debit side, "Apl. 24, 1883, coupons $510." So far the facts are undisputed.

Manifestly this charge against the board of $510 was erroneous unless the bank did in fact pay, or which is the same in effect, give credit for these coupons to somebody. It is not claimed or suggested that any such credit was ever given. And the claim that they were paid rests upon the following facts: that they were treated as cash and would have been cashed by either of the city banks at any time upon presentation by a reputable holder; that the bank had possession of them; that the paper to which they were attached bore its stamp of payment; that they were charged to the board of education and no corresponding credit was given; and that at the close of the day's business it had no more cash than its books called for.

These circumstances would raise a presumption of payment. But it would not be conclusive. Each and all of them might be contradicted or explained or overcome by other evidence, and the presumption would be fully rebutted by proof that it got them of plaintiff without actually paying them. In that case the bank might have had no more cash than its books called for, but would have had $510 more than they ought to have called for; the stamp and charge and omission of credit would have been all in error and of no effect; and its possession would have given it no right to retain them against the demand of plaintiff.

The only question, then, is whether it got them of him without paying them. If it did not it is of no concern to him or to the court, in this case, how it did get them.

Of the fact that it got them of him, the evidence leaves no room for a reasonable doubt. It is true the plaintiff himself

testified that he had no independent recollection of receiving these coupons from the collector or of ever seeing them until long after the transaction; but his own minutes, as of that day, on the blank check to which they were pinned, in connection with the book entries mentioned, enabled him to state with absolute confidence that they were on that day put in its possession by him.    This evidence was competent and proper. Lawrence v. Stiles, 16 Ill. App. 489.    The bank certainly got them and charged them to the board on that day.    Other and disinterested witnesses prove that they were held previously on the same day by the First National Bank and then by the collector, who paid them as cash to the plaintiff.    There is nothing tending to show that he lost them or transferred them to a third party, or any possession of them between that of plaintiff and that of defendant.

Had they been presented to the bank by any other person there would have been no such memorandum attached to them as that which appeared on the blank check.    No such claim is made.    On this point the evidence is all one way, and it must be accepted as a fact that it got them of him.

The case is then narrowed to the question whether he took or received anything from it for them.    That, too, seems to admit of but one answer.    Nothing could be more positive, certain and unqualified than his statement that he never did There was no check, entry or memorandum of any kind tending to show the contrary.    From the date of its organization he had deposited in that bank all the funds he had received as treasurer of the board of education.    They had been paid out on orders of the board upon him, and not upon his check. He says :    " I never gave, in the ten or eleven years I was treasurer, but three checks as treasurer; one was when we transferred the account from the People's Bank to the Third National Bank, and one check when I transferred the money to Price Fell, my successor, and the third time when Mr. Tryner was elected treasurer;" and further, that during all that time "he had nothing to do with keeping the account as treasurer of the board of education; the bank always did that."    These statements were not contradicted in any way.

He had never received or claimed or asked anything for his services as treasurer, directly, but only through his interest in the bank, which had the benefit of the deposits. What, then, should or would he do—or at least intend to do—with these coupons, which were paid to him as such treasurer, and the amount of which was included in the receipt he gave to the collector, except deposit them to the credit of the board's account? No occasion or reason is shown for any exceptional mode of dealing with this item of the trust fund. Nobody supposes that he meant to steal it; nor is there any ground for the supposition that he may have had some special use of his own for it just at that time and so used it with the intention of replacing it. But it is asked why, if he intended to deposit these coupons, did he not include them with the collector's check in the deposit ticket he made out, but put them on the teller's spindle, like paid checks? To that question we think the facts shown furnish the answer also given by the plaintiff on his cross-examination : " Just simply because it was overlooked." That is not so extraordinary that we should hesitate to believe it upon the uncontradicted statement of an intelligent and unimpeached witness, though in his own favor. Experience and observation abundantly show the liability of careful business men to make such mistakes and oversights. The plaintiff, on the occasion referred to, had been called from his usual place and occupation to attend for a time to the duties of the teller. In the midst of them, this transaction took place. It was doubtless brief, and on his part probably somewhat hurried. He had been accustomed to receive the amount due from the collector in his single check, which he indorsed and deposited just as he did the one in question. Perhaps the force of habit, in the hurry and distraction of the moment, is all there was to account for his omission from the deposit ticket of these coupons. But they were not cash to be put in the drawer, and paid out as such, nor checks, to be paid and spindled like others. It may be that for that reason, he did not at once determine just what to do with them, and therefore attached the memorandum, which could be spindled without cutting

Bunn v. Third Nat. Bank.

them, and put them there until he should find time to place them or dispose of them as he should determine. Perhaps his intention was to return them directly to the board as his vouchers without having them go through the bank, and so attached it to show the teller and bookkeeper that they still belonged to the board, or to him as its treasurer, and were not to be treated as paid by the bank, or, if he stamped it as paid, that they were to be credited as deposited by the board through him as treasurer. For if they were in fact paid, and therefore to be charged but not credited, as claimed by the bank, we see no reason for the memorandum. Without it, in that case, they would have been returned to the secretary when the pass book was next written up. It really and distinctly shows all the features of a deposit ticket—date, character and amount of the deposit, with the name of the depositor —and the regular deposit ticket may have been thought to be too light to be spindled with the weight of seventeen coupons attached, or less convenient in size and shape for filing.

All this, however, is matter of speculation, or at most, of inference. Plaintiff, himself, has no positive recollection of the facts. He only knows he was not paid for the coupons, and that if he failed to take the proper steps to get credit for them, it was simply an oversight. We are satisfied that if he had been paid, he would not have forgotten it, nor made the useless memorandum.

It is said this pretended failure of recollection discredits him, and that he not only failed to remember the facts, but positively believed that he received no coupons from the collector. It appears that in April, 1887, Mr. Pell having been elected treasurer to succeed him, he transferred to him the balance in his hands as shown by the bank and pass books. Afterward the board discovered from the collector's books that he had paid to plaintiff $510 more than the latter had accounted for, and demanded it of him. Knowing, as he claims, that he had deposited in the bank all he had received, that he had drawn out nothing on his own account and that he had paid over the balance shown by the books kept by the bank, which he had a right to presume correct, he declined

to comply, and repeatedly stated to different parties, that he had no recollection of receiving the coupons, or of seeing them, and believed he did not receive or see them. The board brought suit on his official bond, which he resisted, but on conclusive proof that he had in fact received them, a judgment was rendered against him for that amount and interest. Having paid that judgment, he made demand of the bank for the $510, and on its refusal to pay, brought this suit. On the trial, he admitted these statements, but testified that he had not then seen the memorandum since he spindled it, and believed them to be true. But what of it? He was certainly but simply mistaken. We see no indication of bad faith in anything he is shown to have said or done about them, and if the facts made so little impression that he had forgotten them, it tends to corroborate rather than to discredit his explanation of his failure to get either cash or credit for them.

We are not clear that the oversight was altogether on his part, but if it was and resulted in an error against him, that error should be corrected, notwithstanding his relation to the bank.

It is argued that these coupons are shown to have been paid by the fact that at the close of the day, the bank appeared to have, by actual count, no more cash than the books called for, though if they had not been paid, it should have had $510 more than was so called for.

Had the teller's count of the cash been correct and the bookkeeper's accounts correctly shown the transactions of the day, there would have been no discrepancy; but it is true that if the only error was in their representation that the coupons were paid by the bank, it should have had $510 more, and the fact that it did not, if it was a fact, showed that either that representation was not an error, or else that it was not the only one—but which, is still the question.

It appears that on the 23d of April, 1883, the day before the bank got these coupons, the cash, as counted by the teller at the close of the day's business, was $18.31 less than, according to the bookkeeper's accounts, it should have been; and on the 24th, it was still "short" $8 instead of being "over"

$498, as the bank claims it would have been if plaintiff's theory had been true.

But plaintiff claims that on the 25th, there was found to be an "overage" of $499. It is at and upon this point that the principal difficulty arises.

The teller's cash book, after showing in detail, in different columns, the items of cash on hand as counted, recapitulates as follows:

"Legal tender ...................... $39,000
National currency .................. 19,060
Gold ............................... 1,335
Silver ............................. 2,318.95
Nickels, etc. ...................... 49.30
Cash items ......................... 6,086.53
Dfts. .............................. 231.11

Total .............................. $68,080.89."

It shows also a corrected statement of the total as follows:

```
      * " 68,080.89
          10.
         ─────────
        *68,090.89
           5.75
         ─────────
         68,096.64
         ─────────
```

Am. 499 over."

In the footing of the recapitulation the figure 9 appears to have been written over the figure 8, in the thousand column, as if intended to make the footing 69,080.89; and a like change in the same figure in the corrected statement, in the two places indicated above by the asterisks. Counsel for the defendant insist that the change made was from 9 to 8; and so it would seem from the above statement alone, since it properly expressed the sum of all the numbers that appear to have been added. But from inspection of the page in the record which is understood to be the original page from the teller's book, we should say without hesitation that the

9 was written over the 8.    Moreover, the teller himself testi-
fied that he did so write it; and further, that besides the
items 10 and 5.75, discovered on recounting and noted in
the corrected statement, there was in fact another, of $1,000,
which he did not so note; that he then wrote the "result
shown" "499 over," when without that item his cash would
have been about $500 short; and that this overage, with only
the usual slight variations, continued to appear by actual
count until the 22d of May, when it was taken from the
counter and put in the safe as overage, of which fact he made
a note in his book at that time.

These statements, if true, would close up every way of
escape from the conclusion that the bank did not pay these
coupons.    No attempt is made to reconcile them with any
other.    The ground taken is that they are not true; at least,
that he did not find the $1,000 mentioned, among his cash.
But this is mere assumption, resting solely upon the abstract
improbability of the alleged fact.    However improbable it
might seem, in advance, that a teller would overlook so large
an item, and that when found he would not specifically note
it, though he so noted other and insignificant items so over-
looked and found, and that he would be unable six years
afterward to tell of what it consisted or how it was found,
such improbability would not make these circumstances
legal evidence tending to prove it was not found.    In the
same sense the facts upon which almost every law suit is
based are improbable.    They are out of or contrary to the
usual course in like cases respectively.    If it were not
abstractly improbable that makers of plain promissory notes
would fail to pay them according to their tenor, we would
have no suits upon such instruments, for they would not
be in use.    As already observed in reference to plaintiff's
alleged oversight in the matter of his deposit ticket, such
facts may be legally and satisfactorily proved by the un-
aided testimony of a single witness, and their abstract improb-
ability is not legal evidence to the contrary.    Here the
finding of the $1,000, at first overlooked, was clearly testified
to by the person who claims to have found it.    His intelli-

gence is not questioned. His veracity was not impeached, generally, nor were his statements contradicted on any point at all material. They were corroborated by contemporaneous book entries made in the regular course of business and line of duty. True, this item was not specifically noted when found. Nor was it necessary it should be. The total amount was what was required to be ascertained. Consisting of divers sums of different classes of items, it was convenient and helpful to note them separately and specifically, but, as to this particular item, and even $1,000, when he had added up those noted and stated the sum, it was sufficient for the purpose in view simply to include it by changing the statement of that sum when he discovered the omission. That was done. Having been stated at $68,080.89, it was changed to $69,080.89 and then the result as $499 " over," when without such finding and addition it would have been more that $500 " short."

These statements and figures necessarily import a finding of $1,000, at first overlooked, on that day, and are tantamount to a specific entry of that item at that time. And they are to be received with more confidence because they were made against the credit and interest of the witness, and before any controversy had arisen or been anticipated between his father and the bank. Why should he then admit an error on his own part and charge himself with $1,000 if he did not have it? They are further corroborated by the series of entries consistently following from day to day, showing substantially the same overage, with no other explanation than the one he gave, and by the testimony of the plaintiff as to his deposit of the coupons and as to the appearance and disposition of the overage on the 22d of May, when, according to the book, it was " put in safe" as overage and then dropped from $479 to $17.08.

Defendant denies the finding of this item and insists that the book shows a shortage of more than $500 on the 25th of April, notwithstanding the entry " 499 over." It is not denied, however, that the same book shows an overage of nearly $500 on the 26th. (Mr. Frank Bunn, who kept it, says $492.23, and Mr. Waddle, who succeeded him as teller in

April, 1885, and was called as a witness by defendant, says
$477.33.) Here is a difference of $1,000 wholly unaccounted
for, unless by the deposit of these coupons without payment.
If that item was not found on the 25th as the teller states, the
shortage of $500, which the defendant claims then appeared,
should have appeared on the 26th also, and continued to
appear, since nothing is claimed to have been discovered at
any time afterward to account for its appearance or to make
it up.

Thus, in respect of abstract improbability, defendant's
theory of the case has but little, if any, advantage over that
of plaintiff, while, unlike the latter, it is without evidence to
support it.

According to each there were errors—perhaps somewhat
unusual in extent—in the cash account, or in the book entries,
or in both, and just how they came to be committed is not
shown.   But this is not very remarkable ; certainly not incred-
ible.   The teller did not pretend to know, nor do we learn
from any source how he failed to find an overage of $500 on
April 24th, as he ought if the coupons were deposited and
not paid on that day, nor how it was that he overlooked the
$1,000 on his first count on the 25th.   Yet the facts as stated
may have occurred in any one of several different ways, and
the statement should not of itself discredit any witness, espe-
cially when made against his interest.   Occasional errors and
oversights of this kind are to be expected.   The fact of their
occurrence is to be believed when proved in the usual manner,
unless the witness is discredited on some other and a reason-
able ground.   We apprehend that the plaintiff and his son
were discredited by the jury in this case, largely on account
of these admitted errors and oversights, though neither was
responsible for those of the other, and that the verdict was
based, not on any contradictory evidence, but on the sup-
posed want of credible evidence on behalf of the plaintiff.
And while it is the province of the jury, exclusively, in the
first instance, to judge of the credibility of witnesses, their
judgment should not be allowed to stand if it appears to the
court to be clearly unreasonable.   It so appears to us in this

case. And we are of opinion that they were probably also misled to some extent in the same direction by the third and sixth instructions given for the defendant.

All of the force of the third is in its implication that there was evidence tending to show that plaintiff, both out of court, and as a witness on a former trial, had pledged his veracity for statements concerning the coupons which were untrue in fact and different from his testimony in this case. We find no such evidence in the record. The statements referred to were not affirmations but negations. Some of them were expressed to be according to his recollection, and all were in their nature matter of recollection, and not of absolute knowledge. The undisputed facts, aside from his statement, leave no doubt that he honestly and confidently believed them at the time he made them, and with such apparent reason as divested them of all tendency to impeach even his general recollection. Who of us has not, for like reasons, with like confidence, denied his own sayings and doings and receipts, and been honestly surprised by conclusive evidence to the contrary? The differences between the statements here referred to were not of the kind which the law or reason would allow to be considered with reference to the credibility of the witness. We feel sure that this instruction should not have been asked.

The sixth treats the teller's entry of April 25th, "499 over" as a "conclusion of Frank Bunn," which should not govern the jury, if they believed, from the whole evidence, there was a shortage. Certainly the jury should be governed as to the finding upon every issue, by what they believe from the whole evidence in relation to it. But it was not proper to characterize this item of that evidence as a "conclusion of Frank Bunn." It did not purport to be nor was it in fact any such thing. It purported to be and was a conclusion of the arithmetic, which is a very different thing. The data were given, being the amount called for by the bookkeeper's book and the amount appearing by the teller's count. The process was simple subtraction, and the result was the difference stated. Its natural and legitimate effect as evidence was quite different from that of a conclusion of the

witness. Its importance lay in the fact that it was not his, but the arithmetical conclusion stated by him at that time. As such, it strongly tended to prove, if it did not conclusively prove, that the figure 8 in the footing of the cash items was changed to 9, and not 9 to 8; that an item of $1,000 was added to them, though not specifically noted among them, and that there was in fact an overage and not a shortage of cash. In that view it would give a very different complexion to the "whole evidence" from any that a "conclusion" of Frank Bunn or any other witness could impart. Its peculiar bearing as a contemporaneous entry of such a conclusion, made when there was no question existing or contemplated between these litigants, is not only ignored but hidden by the instruction. It also implies a contradiction between the witness and the "whole evidence" on the question of shortage or overage, unfavorably affecting his credibility, which does not seem to be warranted. He testified to the entries, and consistently with them, as he represented them, and that constituted the whole of the direct evidence upon that question. There was no proof that he misrepresented them, and the collateral or circumstantial evidence, being the testimony of the plaintiff, corroborated him.

We see no error in sustaining the demurrer to the additional count of the declaration. Some other points are suggested by the plaintiff, which we deem immaterial and unnecessary to notice. But because we think the verdict was unsupported by evidence, and clearly against the evidence, and that the two instructions for the defendant referred to were misleading and wrong, the judgment will be reversed and the cause remanded.

*Reversed and remanded.*